UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | | |
|---|---|---|
| MELLISA D. RILEY, | ) | |
| | ) | |
| PLAINTIFF, | ) | CIVIL ACTION NO. |
| | ) | |
| vs. | ) | HON. |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| DEFENDANT. | ) | |
| _____ | ) | |

ALBERT J. DIB, ESQ. (P32497)
**JEFFERSON LAW CENTER**
*Attorney for Plaintiff*
JEFFERSON LAW & FINANCE BLDG
25615 Jefferson Ave.
St. Clair Shores, MI 48081
(586) 270-4010; FAX: 4011
(248) 672-9854 [MOBILE]
adib@jeffersonlawcenter.com
www.jeffersonlawcenter.com

## COMPLAINT

### AFFIDAVIT OF MERIT: DR. FELDSTEIN

*There is no other pending or resolved civil
action arising out of the transaction or
occurrence alleged in the Complaint.*

/s/ *Albert J. Dib*
ALBERT J. DIB, ESQ. (P32497)

**NOW COMES** the above-named plaintiff herein, MELLISA D. RILEY, by and through her attorneys, JEFFERSON LAW CENTER, *by*: ALBERT J. DIB, *Attorney/Director*, and for her cause of action against the defendant UNITED STATES OF AMERICA, states as follows:

### JŪDICIUM — LOCUS IN QUO

1.     This action arises out of the Federal Tort Claims Act, 28 U.S.C.A. §§ 2671 et seq.

2.      The United States District Court for the  Western District of Michigan  is vested with original jurisdiction under the provisions of 28 U.S.C.A. § 1346(b).

3.      Plaintiff, Mellisa D. Riley ["*Ms. Riley*"], was and still is a resident and citizen of Niles, Berrien County, Michigan, with residence located at 2407 S. 13th St.; the same being located within the Western District of Michigan.

4.       The acts and omissions complained of herein occurred within the Western District of Michigan. Thus, venue properly lies within this Court's jurisdiction.

5.      Upon information and belief, the negligent medical care and treatment rendered to the Plaintiff was by committed by Eeka W. Marshall ("*Marshall*"), an obstetrician/gynecologist ("*OB/GYN*"), a deemed employee from Cassopolis Family Clinic Network ("*Health Center*"), a deemed federally supported health center located in Cassopolis, Michigan. As such, the Federally Supported Health Centers Assistance Act of 1992, as amended, 42 U.S.C. § 233(g)-(n), provides that the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671-2680, is the exclusive remedy for injuries caused by employees of a deemed community health center. Therefore, the defendant United States of America is the proper defendant and this Court has jurisdiction, as stated herein.

6.      Defendant and the Health Center, hold themselves out to the public to use that degree of care, skill, diligence, and attention employed by physicians and clinics and other health care facilities, generally and within the community, in the care and treatment of patients.

7.     The Health Center has in its employ, among others, physicians, nurses, and other personnel, over which it exercises exclusive control and supervision, with the right to employ and discharge such employees.

8.     Upon information and belief, and at all times pertinent hereto, Marshall was acting within the scope of her office, employment and duties, is and/or was a physician duly licensed to practice medicine in the United States and Michigan and is and/or was a health care provider practicing obstetrics and gynecology at the federally supported Health Center and is and/or was considered to be an employee of Defendant United States of America.

9.     Defendant United States of America, permits and holds this community Health Center, its officers and staff, to be federal employees for the purposes of malpractice tort claims against such community health centers.

10.     Plaintiff properly presented her administrative claim (Standard Form 95, Claim for Damage, Injury or Death, pursuant to the Federal Tort Claims Act) within two years of the claim's accrual as a prerequisite to the commencement of this civil action in tort, as required by 28 U.S.C. § 2675; 28 C.F.R. § 14.1. On May 17, 2018, Plaintiff presented her administrative tort claim (No. 2018-0448) to the Department of Health & Human Services' Claims Office, Office of the General Counsel ("*the Agency*"), in Washington, D.C. The Agency failed to make a final disposition of her claim within six months after it was filed. As such, Plaintiff has exhausted her administrative remedies, deems her claim denied, and files this suit pursuant to 45 CFR 35.2(b) and 28 U.S.C. 2675(a).

11.     At all times pertinent, Marshall attended to, diagnosed, cared for, examined, delivered and/or provided professional health care services to, and/or treated Ms. Riley within the scope of her employment as a deemed employee of the federally supported Health Center, and in her professional capacity, in Berrien County, Michigan, thereby establishing a physician/patient relationship with her.

12.     This action for medical negligence, gross negligence, intentional, or willful or wanton conduct, and other wrongdoing, seeks damages in the amount of **FIVE-MILLION DOLLARS** ($5,000,000.00) for harm and permanent injuries, and for exemplary damages to compensate Ms. Riley for the humiliation, sense of outrage and indignity resulting from injuries maliciously, willfully and wantonly inflicted upon her by the Defendant.

### *PRÉCIS OF CASE*
### *FACTUAL ALLEGATIONS*

13.     Plaintiff incorporates by reference paragraphs 1—12 above, as though fully stated herein, paragraph by paragraph and word for word.

14.     On March 7, 2016, Ms. Riley was treated by Marshall.  Ms. Riley's chief complaint was heavy menstruation lasting two weeks at a time.  In the following weeks, Ms. Riley had made repeated visits to Marshall, who administered various diagnostic tests.  Ms. Riley's diagnoses included dysfunctional uterine bleeding, symptomatic fibroid uterus, and bilateral ovarian masses, among other things.

15.     On April 25, 2016, Ms. Riley consulted with Marshall to discuss treatment options for her diagnoses.   She was scheduled to undergo a total abdominal

4

hysterectomy on May 18, 2016.  During Ms. Riley's consultations with Marshall, it was discovered that she had extensive uterine and/or placental adhesions, putting her at an increased risk of complication during the procedure.

16.     Ms. Riley reported to Lakeland Hospital, Niles on May 18, 2016, and underwent the scheduled hysterectomy.  This procedure required careful dissection, good lighting, and exposure of appropriate structures. Upon entering the peritoneal cavity, the incision should be made more superiorly and the bladder avoided when extending the incision inferiorly. The bladder is positioned anterior to the vagina, cervix, and lower uterine segment. The vesicouterine fold, or pouch, is a reflection of the anterior peritoneum that lays between the dome of the bladder and the lower uterine segment. The base is opposed to the cervix and vagina with the vesicocervical and vesicovaginal fascia. The bladder is divided into the dome superiorly and the base inferiorly. The base contains the trigone, including the ureters, which enter posteriorly, and the urethra, which exits at the most inferior aspect of the bladder. Upon opening the pararectal space, identification of the ureters should be done to ensure their safety during clamping. Dissection of the vesicovaginal space is most effective when it is done sharply with adequate traction and countertraction. This can be achieved by gently pulling the bladder anteriorly with a Babcock clamp, using scissors to dissect close to the cervix. The round ligaments and infundibulopelvic ligaments should be takedn first and then the fundus pushed into the upper abdomen. This helps keep the bowel out of the field and gives better visualization of the vesicovaginal space. The anterior fornix should be entered with a scalpel and then Jorgensen scissors used to excise the cervix.

This helps protect the bladder, and also maximizes vaginal length. A modified lithotomy position with universal stirrups should be used to maintain access to the bladder for cystoscopy, in case it is needed later. Sharp dissection should be used to mobilize the bladder off the anterior cervix. The most important principle for prevention of urinary tract injury is to develop and divide tissue planes to identify and isolate the structures of the lower urinary tract before operating on other pelvic structures. Anatomic variation and pelvic pathology may obscure tissue planes, thereby increasing the risks of an injury.

17.     Injury to the bladder may occur while dissecting the bladder away from the lower uterus, cervix, and upper vagina during hysterectomy. This tissue plane is usually easy to find and dissect. However, one or more previous cesarean deliveries (as here) may cause fibrosis and scarring. In this setting, there is increased difficulty in dissecting the tissue plane with a higher risk of bladder injury.

18.     As mentioned, sharp dissection should be used, with or without electrosurgery, whether the dissection is easy or difficult. Blunt dissection is not performed when developing this tissue plane. Blunt dissection may result in increased bleeding or tearing of the bladder. Bladder injury that occurs with sharp, rather than blunt, dissection can often be easier to repair. At abdominal hysterectomy, having the first assistant constantly pulling the uterus up, while the OB/GYN mobilizes the bladder and ligates the uterine arteries and the cardinal/uterosacral ligaments, facilitates descent of the bladder and ureters away from these structures, decreasing the risk of injury.

19.     Urinary tract injury is a known complication of gynecologic surgery. Intraoperative identification of injury permits prompt repair and lessens postoperative sequelae including patient morbidity and cost. Delayed diagnosis of urinary tract injuries results in complications beyond the site of the injury, such as genitourinary fistula formation.[1] Prevention of urinary tract injury and sequelae is a central principle of pelvic surgery. The most important method for primary prevention is intraoperative identification of the bladder and ureters and avoidance of injury through meticulous surgical technique, as previously described. Intraoperative recognition and repair of injury is a secondary method of prevention of injury. When injuries do occur, prompt intraoperative diagnosis and management help to avoid sequelae such as ureteral obstruction and ureterovaginal or vesicovaginal fistula formation. This is accomplished through OB/GYN careful and thorough inspection of pedicle and urinary tract structures and awareness of potential signs of injury (*e.g.*, urine in the operative field). Routine use of cystoscopy is another option.

20.     Patient positioning in the dorsal lithotomy rather than supine position provides better access for evaluation of the urinary tract with cystoscopy or other methods that require access to the urethra. For abdominal hysterectomy, one option that avoids having to reposition the patient during surgery is to position the patient in lithotomy stirrups that can adjust from a low to high position (*e.g.*, Yellofin) at the start of surgery, prior to prepping and draping. A self-retaining retractor that does not interfere with the thighs (*e.g.*, Bookwalter) must be used when the patient is in

---

[1] Blackwell RH, Kirshenbaum EJ, Shah AS, et al. Complications of Recognized and Unrecognized

lithotomy position. This setup also allows a second surgical assistant to stand between the patient's legs when performing cystoscopy, which facilitates performing the procedure and improves visibility.

21.     Placement of a bladder (Foley) catheter may be helpful in procedures in which there is a potential for urinary tract injury. If there is an increased risk of injury, a triple lumen (three-way) catheter can be used, which will allow instillation of contrast material if bladder injury is suspected. Persistent blood-tinged urine in the catheter output should prompt evaluation for urinary tract injury.

22.     Urinary tract injury may occur through direct contact with a surgical instrument, a suture or a stapling device, or as a result of devascularization or denervation. Risk factors for urinary tract injury include: increased body mass index (present here), prior pelvic surgery, one or more prior cesarean deliveries (present here), endometriosis (present here), urinary tract abnormalities, surgery for malignancy, and surgery for urinary incontinence or pelvic organ prolapse.  Potential consequences of lower urinary tract injury includes genitourinary fistula, as what occurred here.

23.     An OB/GYN must become familiar with the anatomy of the urinary tract and must be aware of common intraoperative and postoperative complications to decrease the risk of morbidity.

24.     During the hysterectomy, Marshall iatrogenically injured Ms. Riley's bladder. Despite the potential for such injury, Marshall did not take adequate measures to prevent it from happening, failed to notice when it happened, and failed to detect it

---

Iatrogenic Ureteral Injury at Time of Hysterectomy: A Population Based Analysis. J Urol 2018; 199:1540.

before concluding the procedure.  Had Marshall noticed and/or detected she had iatrogenically injured Ms. Riley's bladder, corrective measures would have been taken to prevent the subsequent formation of a vesicovaginal fistula.

25.     After performing the hysterectomy, Marshall noted the presence of blood in Ms. Riley's Foley catheter, an indication of bladder injury. She flushed the catheter with saline and neglected to investigate the source of blood further.  On May 19, 2016, Ms. Riley had her blood drawn.  The results from that test indicated Ms. Riley had a low red blood cell count, low hemoglobin level, low hematocrit level, and high white blood cell count; all signs of bladder damage.  Ms. Riley also complained of shooting pain while voiding, another common side effect of bladder injury.  Despite obvious signs of bladder injury, a well-known complication of hysterectomies, Marshall did not investigated these signs further.

26.     On May 21, 2016, Ms. Riley complained of abdominal and bladder pain to Marshall who disregarded the complaint and claimed the pain was normal for the procedure.  Then, Ms. Riley was discharged from Lakeland Hospital, Niles before any corrective measures were taken to address the damage to her bladder.

27.     On May 22, 2016, Ms. Riley presented to the Lakeland Hospital, Niles emergency department complaining of dysuria, bladder pressure, and constant/persistent abdominal pain.  A urological consult and diagnostic tests were ordered.  A CT scan found a fistula on Ms. Riley's bladder.

28.  A vesicovaginal fistula is an abnormal communication between the female genital tract and the bladder, urethra, or ureters. These fistulas are most often sequelae

of iatrogenic injury during gynecologic surgery. Postsurgical vesicovaginal fistula may be caused by direct injury during dissection, in which case, the injury should be recognized at surgery or in the immediate postoperative period. More subtle causes include clamp or crush injury, cautery, or suture impingement, kinking, or placement through the bladder. Blood supply is compromised to the affected tissues with resulting necrosis and eventual tissue breakdown. The process takes from days up to a month. The best prevention for vesicovaginal fistula is avoidance of the injury at the primary surgery. The risk of fistula formation depends upon both the location of injury and intraoperative diagnosis and repair. Standard pelvic surgery technique requires an awareness of the bladder anatomy in order to minimize urinary tract trauma and optimize safety. Steps to avoid fistula formation include identification of the proper plane between the bladder and cervix; use of sharp dissection to develop the bladder flap rather than blunt dissection or use of electrocautery, ensuring that the bladder is dissected below the level that the cervix will be transected from the vagina; and intraoperative identification of any lower urinary tract injury using proper techniques, *e.g.*, intraoperative cystoscopy.[2] Vesicovaginal fistulas result from unrecognized bladder

---

[2] American College of Obstetricians and Gynecologists. ACOG Committee Opinion. Number 372. July 2007. The Role of cystourethroscopy in the generalist obstetrician-gynecologist practice. Obstet Gynecol 2007; 110:221; AAGL Advancing Minimally Invasive Gynecology Worldwide. AAGL Practice Report: Practice guidelines for intraoperative cystoscopy in laparoscopic hysterectomy. J Minim Invasive Gynecol 2012; 19:407; Ibeanu OA, Chesson RR, Echols KT, et al. Urinary tract injury during hysterectomy based on universal cystoscopy. Obstet Gynecol 2009; 113:6; Kim JH, Moore C, Jones JS, et al. Management of ureteral injuries associated with vaginal surgery for pelvic organ prolapse. Int Urogynecol J Pelvic Floor Dysfunct 2006; 17:531; Sakellariou P, Protopapas AG, Voulgaris Z, et al. Management of ureteric injuries during gynecological operations: 10 years experience. Eur J Obstet Gynecol Reprod Biol 2002; 101:179; Chi AM, Curran DS, Morgan DM, et al. Universal Cystoscopy After Benign Hysterectomy: Examining the Effects of an Institutional Policy. Obstet Gynecol 2016; 127:369.

injuries.[3]

29.     A repair was attempted on May 23, 2016 by Dr. Kraklau.  The procedure involved going through Ms. Riley's abdomen, making an incision in the bladder, the placement of bilateral stents, and suturing the laceration and the incision.   Ms. Riley was discharged on May 26, 2016.

30.     Ms. Riley returned to the Lakeland emergency department several times, complaining of dysuria, leakage from her Foley catheter, UTI, urosepsis, flank pain, and/or increased urinary frequency.

31.     As her condition failed to improve, Ms. Riley sought to have her fistula treated at University of Michigan Hospital.  There, she underwent a second fistula repair on September 2, 2016, performed trans-vaginally.

32.     After the second repair-attempt, Ms. Riley's issues with UTIs and pain persisted.  In October 2016, Ms. Riley began leaking urine from her vagina, indicating she still had a vesicovaginal fistula.  Accordingly, she underwent a third fistula repair on January 2, 2017.

**WHEREFORE**, Plaintiff requests that this Court enter judgment or award against the Defendant in whatever amount is appropriate to compensate Ms. Riley for the injuries and damages so wrongfully sustained as a result of Defendant's wrongdoing alleged herein, together with interest, court costs, and attorney fees.

## COUNT I

### *MEDICAL ERRORS*

---

[3] Tancer ML. Observations on prevention and management of vesicovaginal fistula after total hysterectomy. Surg Gynecol Obstet 1992; 175:501; Hadley HR. Vesicovaginal fistula. Curr Urol Rep 2002; 3:401.

33.     Plaintiff incorporates by reference paragraphs 1-32 above as though fully stated herein, paragraph by paragraph and word for word.

34.     As described, *vide infra*, Marshall committed numerous medical errors which were preventable, and which had an adverse and/or harmful effect on Ms. Riley. This consisted of failing to carefully and thoroughly evaluate the urinary tract at the conclusion of the hysterectomy (*e.g.*, cystoscopy, intravenous pyelogram) to rule out any urinary tract injury, including bladder injury, and consequently caused Ms. Riley to become permanently injured and harmed, rendering her permanently and completely disabled, and permanently incapable of independently performing the activities of normal, daily living.

35.     Marshall chose inappropriate methods of care. A 2000 Institute of Medicine report estimated that medical errors result in 1,000,000 excess injuries each year in U.S. institutions.[4]  In fact, between 10-15 percent of diagnoses are erroneous.[5]

WHEREFORE, Plaintiff requests that this Court enter judgment or award against the Defendant in whatever amount is appropriate to compensate Ms. Riley for the injuries and damages so wrongfully sustained as a result of Defendant's wrongdoing alleged herein, together with interest, court costs, and attorney fees.

---

[4] INSTITUTE OF MEDICINE (2000). *To Err Is Human: Building a Safer Health System*. WASHINGTON, DC: THE NATIONAL ACADEMIES PRESS. doi: 10.17226/9728. ISBN 978-0-309-2617 4-6.e; CHARATAN, FRED (2000). "*Clinton acts to reduce medical mistakes*." BMJ PUBLISHING GROUP. doi:10.1136/bmj.320.7235.597. Retrieved 2006-03-17.; WEINGART SN, WILSON RM, GIBBERD RW, HARRISON B; WILSON; GIBBERD; HARRISON (MARCH 2000). "*Epidemiology of medical error*". BMJ. 320 (7237): 774-7.
[5] BEMER, E. S.; GRABER, M. L. (2008). "*Overconfidence as a cause of diagnostic error in medicine*." AMERICAN JOURNAL OF MEDICINE. 121: S2-S23.

## COUNT II

### MALPRACTICE / PROFESSIONAL NEGLIGENCE

36.     Plaintiff incorporates by reference paragraphs 1—35 above, as though fully stated herein, paragraph by paragraph and word for word.

37.     The applicable standard of care or practice in this case as to Marshall as it relates to the examinations, care, treatment, diagnosis, and professional services provided by her to Ms. Riley, is what an OB/GYN of ordinary learning, judgment or skill would or would not do under same or similar circumstances.

38.     An OB/GYN focuses on the health of women before, during, and after childbearing years, diagnosing and treating conditions of the reproductive system and associated disorders. Obstetrician-gynecologists are physicians who possess special knowledge, skills and professional capability in the medical and surgical care of the female reproductive system and associated disorders, such that it distinguishes them from other physicians and enables them to serve as consultants to other physicians and as primary physicians for women. Over the years of practice, each obstetrician-gynecologist builds upon this broad base of knowledge and skills and may develop a unique type of practice and changing professional focus. Such diversity contributes to high-quality health care for women. Resident education in obstetrics-gynecology includes four years of accredited, clinically-oriented graduate medical education, which is focused on reproductive health care and ambulatory primary health care for women, including health maintenance, disease prevention, diagnosis, treatment, consultation, and referral. Obstetrics and gynecology is a broad and diverse branch of

medicine, including surgery, management of the care of pregnant women, gynecologic care, oncology, and primary health care for women. OB/GYNs see a variety of medical conditions in the office, perform surgery, and manage labor and delivery. Office practice consists of providing women with preventive examinations and other primary care and identifying gynecologic problems. OB/GYNs typically evaluate infertility, abnormal uterine bleeding, leiomyomata, pelvic masses, pelvic organ prolapse, abnormal Pap smears, pelvic pain, endometriosis, breast disorders, and urinary incontinence. Examples of minor office procedures are colposcopy, endometrial biopsy, Pap smears, and vulvar biopsy. Office ultrasound is performed for both obstetrics and for gynecologic conditions. OB/GYNs may also provide considerable primary care in addition to the typical gynecologic procedures. Examples of outpatient procedures include laser surgery, diagnostic laparoscopy, operative laparoscopy such as laparoscopic ovarian cystectomy, tubal ligation, diagnostic and operative hysteroscopy, and endometrial ablation. Inpatient surgical procedures include hysterectomies performed vaginally, abdominally, and laparoscopically. Other examples of inpatient procedures include abdominal or laparoscopic myomectomies. Obstetrical procedures include cervical cerclage, dilation and curettage, amniocentesis, Cesarean section, circumcision, and forceps and vacuum deliveries. The specialty of OB/GYN covers a variety of health care for women. As such an OB/GYN can perform primary care, have continuity of care, and provide surgical services.

39.     The applicable standard of care in 2016, with respect to the care,

treatment, and management of a patient presenting with the conditions, findings, signs and symptoms exhibited by Ms. Riley (*e.g.*, history of C-section, severe endometriosis, bilateral endometriomas, morbid obesity, scaring, adhesions, large ovarian cysts, fallopian tubes not seen, etc.), and which should have been adhered to by Marshall—*given the complexity of the case*—included, among other things, careful and thorough evaluation of the urinary tract at the conclusion of the hysterectomy (*e.g.*, cystoscopy, intravenous pyelogram) to rule out any urinary tract injury, including bladder injury, as had been done to rule out injury to the bowel.

40.    Given the complexity of the case, Marshall breached the applicable standard of care by failing to carefully and thoroughly evaluate the urinary tract at the conclusion of the hysterectomy (*e.g.*, cystoscopy, intravenous pyelogram) to rule out any urinary tract injury, including bladder injury, as had been done to rule out injury to the bowel.

41.    In support of Plaintiff's claims against Marshall, Plaintiff submits and attaches the following Affidavit of Merit executed by Marc Stuart Feldstein, M.D., FACOG, which is incorporated by reference, paragraph by paragraph and word for word, and made part of this Complaint:

### AFFIDAVIT OF MERIT ON BEHALF OF MELLISA RILEY

STATE OF ILLINOIS)
COOK COUNTY)

MARC STUART FELDSTEIN, MD, FACOG, being sworn, states:

1. I am a Doctor of Medicine (M.D.), licensed to practice medicine in Illinois.

2. From 1996 to the present, I have been board-certified and recertified in Obstetrics and Gynecology by the American Board of Obstetrics and Gynecology. Attached is my Curriculum Vitæ, which sets forth my credentials, training, education, and experience, and which I incorporate by reference.

3. From 1994 to the present, I have continuously devoted a majority of my professional time to the active clinical specialty practice of Obstetrics and Gynecology.

4. I am familiar with the matter involving Mellisa D. Riley because I have reviewed the following:

   a. Records from Lakeland Hospital, University of Michigan.
   b. Notice of Intent to File Claim under MCL § 600.2912b.

5. The applicable standard of care or practice in this case is what an Obstetrician/Gynecologist (OB/GYN) of ordinary learning, judgment or skill would or would not do under same or similar circumstances, and the reasonable care, diligence, and skill ordinarily and/or reasonably exercised and possessed by similarly staffed and equipped hospitals and clinics under same or similar circumstances. It is my understanding that, at all times pertinent hereto, Eeka W. Marshall was an OB/GYN obligated to adhere to the applicable, recognized, and then existing standards of practice or care in this case.

   An OB/GYN focuses on the health of women before, during and after childbearing years, diagnosing and treating conditions of the reproductive system and associated disorders. Obstetrican-gynecologists are physicians who possess special knowledge, skills and professional capability in the medical and surgical care of the female reproductive system and associated disorders, such that it distinguishes them from other physicians and enables them to serve as consultants to other physicians and as primary physicians for women. Over the years of practice, each obstetrican-gynecologist builds upon this broad base of knowledge and skills and may develop a unique type of practice and changing professional focus. Such diversity contributes to high-quality health care for women. Resident education in obstetrics-gynecology includes four years of accredited, clinically-oriented graduate medical education, which is focused on reproductive health care and ambulatory primary health care for women, including health maintenance, disease prevention, diagnosis, treatment, consultation, and referral.

   Obstetrics and gynecology is a broad and diverse branch of medicine, including surgery, management of the care of pregnant women, gynecologic care, oncology, and primary health care for women. OB/GYNs see a variety of medical conditions in the office, perform surgery, and manage labor and delivery. Office practice consists of providing women with preventive examinations and other primary care and identifying gynecologic problems. OB/GYNs typically evaluate infertility, abnormal uterine bleeding, leiomyomata, pelvic masses, pelvic organ prolapse, abnormal Pap smears, pelvic pain, endometriosis, breast disorders, and urinary incontinence. Examples of minor office procedures are colposcopy, endometrial biopsy, Pap smears, and vulvar biopsy. Office ultrasound is performed for both obstetrics and for gynecologic conditions. OB/GYNs may also provide considerable primary care in addition to the typical gynecologic procedures. Examples of outpatient procedures include laser surgery, diagnostic laparoscopy, operative laparoscopy such as laparoscopic ovarian cystectomy, tubal ligation, diagnostic and operative hysteroscopy, and endometrial ablation. Inpatient surgical procedures include hysterectomies performed vaginally, abdominally, and laparoscopically. Other examples of inpatient procedures include abdominal or laparoscopic myomectomies. Obstetrical procedures include cervical cerclage, dilation and curettage, amniocentesis, Cesarean section, circumcision, and forceps and vacuum deliveries. The specialty of OB/GYN covers a variety of health care for women. As such an OB/GYN can perform primary care, have continuity of care, and provide surgical services.

6. Based on my education, training, knowledge, and experience, and my review of the aforementioned materials—*given the complexity of the case*—the applicable standard of care in 2016 with respect to the care, treatment, and management of a patient presenting with the conditions, findings, signs and symptoms exhibited by Mellisa D. Riley (*e.g.*, history of C-section, severe endometriosis, bilateral endometriomas, morbid obesity, scarring, adhesions, large ovarian cysts, fallopian tubes not seen, etc.), and which should have been adhered to by Marshall, included, among other things, careful and thorough evaluation of the urinary tract at the conclusion of the hysterectomy (*e.g.*, cystoscopy, intravenous pyelogram) to rule out any urinary tract injury, including bladder injury, which was done to rule out injury to the bowel.

7. In my opinion—*given the complexity of the case*—Marshall breached the applicable standard of care by failing to carefully and thoroughly evaluate the urinary tract at the conclusion of the hysterectomy (*e.g.*, cystoscopy, intravenous pyelogram) to rule out any urinary tract injury, including bladder injury, which was done to rule out injury to the bowel.

8. There may be additional violations of the standards of care which may be disclosed during litigation and/or certain violations enumerated herein that may not be applicable based on discovery during litigation.

9. As a consequence of Marshall's improper care and treatment, as described herein, Ms. Riley's intraoperative bladder injury was not timely detected, causing complications (*e.g.*, vesicovaginal fistula), and requiring subsequent surgery. Had Marshall properly, carefully, and thoroughly evaluated the urinary tract at the conclusion of the hysterectomy, then the bladder defect would have been identified and repaired intraoperatively, thereby preventing the subsequent formation of vesicovaginal fistula.

10. Marshall had control over Ms. Riley's body during her surgery, and Ms. Riley's injury is of a kind which does not ordinarily occur without someone's negligence. This infers that Marshall was negligent.

11. The opinions expressed herein are based upon, *a)* my training, education and experience, *b)* review of the aforementioned materials, *c)* my familiarity with the applicable, recognized, and then existing standards of care or practice, and *d)* are within a reasonable degree of medical and/or scientific certainty and/or probability.

*THE OPINIONS EXPRESSED HEREIN MAY BE SUBJECT TO CHANGE UPON FURTHER REVIEW OF RECORDS AND/OR MATERIALS IN THIS CASE, AND ARE NOT NECESSARILY INTENDED TO BE FINAL.*

x _Marc Feldstein_
**MARC STUART FELDSTEIN, MD, FACOG**

Subscribed and sworn to before me
this 7th day of November, 2018

3



Notary Public

MATTHEW W LOWELL
Official Seal
Notary Public - State of Illinois
My Commission Expires Jun 29, 2022

**WHEREFORE**, Plaintiff requests that this Court enter judgment or award against the Defendant in whatever amount is appropriate to compensate Ms. Riley for the injuries and damages so wrongfully sustained as a result of Defendant's wrongdoing alleged herein, together with interest, court costs, and attorney fees.

## COUNT III

### *GROSS NEGLIGENCE / INTENTIONAL—WILLFUL—WANTON CONDUCT*

42.    Plaintiff incorporates by reference paragraphs 1—41 above as though fully stated herein, paragraph by paragraph and word for word.

43.    Ms. Riley's urinary tract injury—*i.e., iatrogenic intraoperative bladder injury*—and the complications thereof—*including vesicovaginal fistula, subsequent surgeries, procedures and manipulations of her body*—were negligently and iatrogenically inflicted and/or not timely diagnosed or treated by Defendant, as described herein, and damage occurred and/or worsened, resulting in permanent injury in Ms. Riley. Said iatrogenic injury, delay in diagnosis, and lack of timely treatment caused Ms. Riley to become permanently damaged. Such conduct constitutes gross negligence, *i.e.*, a willful, reckless and wanton disregard for public safety and for Ms. Riley's rights, and an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of Ms. Riley and a thoughtless disregard of consequences, without the exertion of any effort to avoid them.

44.     Iatrogenic urinary tract injury—*i.e.*, *iatrogenic intraoperative bladder injury*—and the complications thereof—*including vesicovaginal fistula, subsequent surgeries, procedures and manipulations of her body*—negligently and recklessly inflicted and/or not properly and timely diagnosed and/or treated, and which results in permanent damage due to negligent/reckless infliction, delay in diagnosis, and lack of timely treatment, constitutes gross negligence or willful or wanton conduct; either is reprehensible and Plaintiff demands exemplary damages for the humiliation, outrage, and indignity resulting from injuries which were maliciously, willfully and wantonly inflicted upon by Ms. Riley by Defendant.  Ms. Riley's vesicovaginal fistula is an unwanted opening that formed between her bladder and the wall of her vagina and resulted in urinary leakage and continuous urine loss from her vagina. In addition to being a serious medical problem, this condition was and is very upsetting to Ms. Riley. The leakage and continuous urine loss is embarrassing to her and smells bad.

WHEREFORE, Plaintiff requests that this Court enter judgment or award against the Defendant in whatever amount is appropriate to compensate Ms. Riley for the injuries and damages so wrongfully sustained as a result of Defendant's wrongdoing alleged herein, and for the humiliation, sense of outrage, and indignity resulting from injuries maliciously, willfully and wantonly inflicted upon her by the Defendant, together with interest, court costs, and attorney fees.

### COUNT IV
#### RES IPSA LOQUITUR

45. Plaintiff incorporates by reference paragraphs 1—44 above, as though fully stated herein, paragraph by paragraph and word for word.

46. Because Defendant had control over Ms. Riley's body and/or the instrumentality which caused her injury, and Ms. Riley's injury is of a kind which does not ordinarily occur without someone's negligence or other wrongdoing, then Defendant's acts or omissions were or are presumed or inferred to be negligent, grossly negligent, careless, reckless, willful, wanton, and/or substandard; this is known as the doctrine of *Res Ipsa Loquitur* ("*The thing speaks for itself*"), or "*Circumstantial Evidence of Negligence.*"

**WHEREFORE**, Plaintiff requests that this Court enter judgment or award against the Defendant in whatever amount is appropriate to compensate Ms. Riley for the injuries and damages so wrongfully sustained as a result of Defendant's wrongdoing alleged herein, together with interest, court costs, and attorney fees.

## COUNT V
### INJURIES/DAMAGES

47. Plaintiff incorporates by reference paragraphs 1—46 above, as though fully stated herein, paragraph by paragraph and word for word.

48. As a direct and proximate result and consequence of Defendant's wrongdoing, as described herein, Ms. Riley's iatrogenic intraoperative bladder injury was not timely detected, causing complications (*e.g.*, vesicovaginal fistula), and requiring subsequent surgery. Had Marshall properly, carefully, and thoroughly evaluated the urinary tract at the conclusion of the hysterectomy, then the bladder

defect would have been identified and repaired intraoperatively, thereby preventing the subsequent formation of vesicovaginal fistula. Plaintiff has suffered permanent deficits and injury, is permanently disabled, and is permanently incapable of independently performing many activities of normal, daily living, among other things.

49.    As a direct and proximate result and consequence of Defendant's wrongdoing, Ms. Riley has required, and will in the future require, attendant, medical, hospital, nursing, pharmaceutical, therapeutic, and rehabilitative care, treatment, equipment, supplies, and services. Expenses for such care, treatment, equipment, supplies, and services have been incurred and will in the future be incurred on her behalf.

50.    As a direct and proximate result and consequence of Defendant's wrongdoing, Ms. Riley has, and will in the future, suffer lost wages and/or loss of earning capacity.

51.    As a direct and proximate result and consequence of Defendant's wrongdoing, Ms. Riley has, and will in the future, sustain physical pain and suffering; disfigurement; disability; mental and emotional pain and anguish; and loss of enjoyment of life, quality of life, and enjoyment of life activities.

52.    Further, Plaintiff demands exemplary damages for the humiliation, outrage, and indignity resulting from injuries which were maliciously, willfully and wantonly inflicted upon by Ms. Riley by Defendant, *to wit*: an unwanted and very upsetting opening between her bladder and the wall of her vagina, resulting in urinary

leakage and continuous urine loss from her vagina. The leakage and continuous urine loss is embarrassing to Ms. Riley and smells bad. A devastating consequence is the impact her fistula has had on her psychosocial life, *e.g.*, shame and social segregation.

### ET INDE PETIT JUDICIUM

**WHEREFORE**, the plaintiff MELLISA D. RILEY herein prays that this Court award compensatory damages against defendant UNITED STATES OF AMERICA, in the amount that shall fairly compensate the Plaintiff for the injuries, losses, and damages wrongly inflicted upon her by the Defendant, and for the humiliation, sense of outrage, and indignity resulting from injuries maliciously, willfully and wantonly inflicted upon her by the Defendant, as stated herein, plus costs, interest, attorney fees, and other relief as is fair, just, and equitable under the circumstances.

JEFFERSON LAW CENTER

BY: /s/ *Albert J. Dib*

ALBERT J. DIB, ESQ. (P32497)
*Attorney for Plaintiff*
JEFFERSON LAW & FINANCE BLDG
25615 Jefferson Ave.
St. Clair Shores, MI 48081-2310
(586) 270-4010 FAX: 4011
(248) 672-9854 [MOBILE]
adib@jeffersonlawcenter.com
www.jeffersonlawcenter.com

DATED: November 19, 2018